Robert W. Shely, #014261
BRYAN CAVE LLP, #00145700
Two N. Central Avenue, Suite 2200
Phoenix, AZ 85004-4406
Telephone: (602) 364-7000
rwshely@bryancave.com

Attorneys for Defendants

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Teresa Follmer, an individual; Katie and John Lividotti, husband and wife, on behalf of themselves and all others similarly situated,<br><br>　　　　　　Plaintiffs,<br><br>vs.<br><br>Bank of America, N.A. and BAC Home Loans Servicing, LP,<br><br>　　　　　　Defendants. | Case No. 2:10-cv-1435-JWS<br><br>**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT**<br><br>**(Oral Argument Requested)** |

Pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6), Defendants Bank of America, N.A. ("BANA") and BAC Home Loans Servicing, L.P. ("BAC") (collectively, "Defendants") move to dismiss Plaintiffs' Class Action Complaint because it fails to state any cognizable claim on which relief could be granted. The grounds for this Motion are set forth in the accompanying Memorandum of Points and Authorities.

RESPECTFULLY SUBMITTED this 2nd day of August, 2010.

　　　　　　　　　　　　　　　　s/ Robert W. Shely
　　　　　　　　　　　　　　　　Robert W. Shely, #014261
　　　　　　　　　　　　　　　　BRYAN CAVE LLP
　　　　　　　　　　　　　　　　2 North Central Avenue
　　　　　　　　　　　　　　　　Phoenix, AZ 85004
　　　　　　　　　　　　　　　　Telephone: (602) 364-7000

　　　　　　　　　　　　　　　　Attorneys for Defendants

673566

## INTRODUCTION

Plaintiffs in this case seek to enforce the federal government's Home Affordable Modification Program ("HAMP") against Defendants. Yet, as a straightforward matter of law, that program creates no private right of action for borrowers such as Plaintiffs. And, as an equally straightforward matter of law, borrowers such as Plaintiffs are not the third-party beneficiaries of the contract under which they seek recovery. This Court need go no further than the allegations of the Complaint to make these rulings of law.

The Complaint does not allege that Plaintiffs' loan terms were unfair, or that the Plaintiffs did not understand the terms of their loans, or that there was anything wrong with the loans themselves. But because of changes in Plaintiffs' personal circumstances, each of them found themselves unable to make their monthly mortgage loan payments and sought a modification from their loan servicer, BAC. At its essence, the Complaint alleges that Defendants were required to give them a permanent mortgage loan modification under HAMP and have not done so.

The law is well-established that there is no private right of action under HAMP. *See, e.g., Marks v. Bank of America, N.A.*, No. 03:10-cv-08039, 2010 WL 2572988, *5-7 (D. Ariz. June 22, 2010). Instead, Plaintiffs assert they are entitled to permanent loan modifications under HAMP because they are intended third-party beneficiaries of a Servicer Participation Agreement between BANA and the U.S. Treasury Department. This claim must fail, however, as it is also clear that Plaintiffs are not third-party beneficiaries under HAMP, as virtually every district court examining the issue has concluded, including many in this Circuit. *See, e.g., id.; Hoffman v. Bank of America, N.A.*, No. C 10-2171 SI, 2010 WL 2635773 (N.D. Cal. June 30, 2010); *Escobedo v. Countrywide Home Loans, Inc.*, No. 09-cv-1557, 2009 WL 4981618 (S.D. Cal. Dec. 15, 2009).

Nor can Plaintiffs state a breach of contract claim based upon BAC's alleged agreements with them. Like the claims dismissed by Judge Teilborg in *Marks*, Plaintiffs here seek to enforce alleged promises to modify their loans. But the Trial Period Plan that Teresa Follmer seeks to enforce cannot be an enforceable contract because it fails to specify the key

2

673566

terms of the permanent modification, and is therefore nothing more than an agreement to agree at some future date. Moreover, because the terms of the permanent modification remained unspecified, Follmer could not have reasonably relied upon that agreement, undermining her claim for promissory estoppel. The Lividottis, by contrast, admit in the Complaint that they made payments in an amount that was less than required under the terms of their loan for the months of February and March 2010 – entitling Defendants to undertake each of the actions of which Plaintiffs now complain. Moreover, neither Follmer nor the Lividottis are entitled to recovery because they have not pled that they suffered any cognizable damages as a result of Defendants' supposed misconduct. Plaintiffs' claims under the Arizona Consumer Fraud Act must likewise fail, as Plaintiffs cannot avoid the bar to private causes of action under HAMP by suing under the ACFA and because Plaintiffs have failed to plead fraud with the particularity required by Federal Rule of Civil Procedure 9(b).

For these reasons, and for the reasons set forth below, Plaintiffs cannot state a claim for relief under any of the myriad theories they advance. The Complaint should be dismissed in its entirety, with prejudice.

## FACTUAL ALLEGATIONS[1]

**A.    *The Home Affordable Modification Program***

In early 2009, the U.S. Treasury announced a national mortgage loan modification program intended to help 3 to 4 million at-risk homeowners avoid defaulting on their mortgage loans by reducing monthly payments. Complaint, Ex. 2 at 1 (HAMP Supplemental Directive 09-01). On March 4, 2009, the government published detailed program guidelines for HAMP, which it then supplemented on April 6, 2009. *Id.* Under the guidelines, borrowers who meet certain criteria may be eligible to have their loans modified. *Id.* at 2.

All servicers of loans that are owned or guaranteed by Fannie Mae or Freddie Mac ("GSE loans") must participate in the GSE versions of HAMP as to those loans. Participation

---

[1] The factual allegations recited herein are taken from Plaintiffs' Complaint and are intended only to aid in the Court's resolution of this motion. By including these allegations in this memorandum, Defendants do not intend to admit them and reserve their right to challenge them at a later date should the need arise.

3

673566

in HAMP is voluntary for servicers as to non-GSE loans. Compl., Ex. 2 at 2. A servicer that chooses to participate in HAMP must execute a Servicer Participation Agreement "with Fannie Mae in its capacity as financial agent for the United States," *id.*, and Bank of America, N.A. did so. Compl., ¶¶ 36-37; *see* Compl., Ex. 1. Since its inception, there have been numerous and substantial changes to HAMP, which has been a constantly evolving new federal program. In the past fifteen months, the Treasury has issued thirteen different supplemental directives and various other documents providing guidance on HAMP, and Fannie and Freddie have each separately issued multiple different bulletins or directives.[2]

Not all mortgage loans are eligible for HAMP, and a participating servicer is not required to modify every HAMP-eligible loan. If borrower eligibility is satisfied, the servicer is obligated *to consider* the borrower for a HAMP modification, assuming it is not precluded from doing so by its other contractual arrangements or investor requirements. Compl., Ex. 2 at 1. Using the borrower's income information, a participating servicer will follow a series of steps (known as the "waterfall") in an effort to adjust the borrower's monthly mortgage payment to 31% of a borrower's total pre-tax monthly income. *Id.* at 8-10. Prior to June 1, 2010, servicers could initially consider a borrower's income, and place the borrower into a Trial Period Plan ("TPP") under HAMP based only on the borrower's "verbal" representation of that income. Compl., Ex. 2 at 5. Unsurprisingly, this process sometimes resulted in borrowers being ineligible for HAMP when their income was later verified. Compl., Ex. 2 at 17-18 (borrower must meet all HAMP conditions to be placed in permanent modification). If application of the waterfall produces an affordable payment, the servicer also subjects the loan to a Net Present Value ("NPV") test. *Id.* at 4-5. If the NPV test produces a "negative"

---

[2] Links to the HAMP supplemental directives and other documentation for non-GSE loans are available at https://www.hmpadmin.com/portal/programs/hamp/servicer.html (last visited July 26, 2010). HAMP guidance for loans owned by Fannie Mae and Freddie Mac is also available online at https://www.efanniemae.com/sf/mha/mhamod/ (last visited July 26, 2010) and http://www.freddiemac.com/singlefamily/service/mha_modification.html (last visited July 26, 2010).

4

673566

result (meaning that losses from foreclosure are less than losses from modification), the servicer is not obligated to modify the loan. *Id.*

If the borrower returns the TPP, together with documents necessary to verify his or her income and eligibility for a HAMP modification (the income information must be 90 days or less dated as of the time of determining eligibility), the servicer may begin the TPP, although it retains ample discretion in this regard. *Id.* at 5-6. A borrower may receive a permanent HAMP modification only if he or she submits all the necessary documentation, is determined to be HAMP-eligible (including that all HAMP requirements continue to be met – *e.g.*, income is verified, NPV is positive, the original mortgage payment exceeds 31% of pre-tax income and the modified payment can be reduced to 31%), and makes timely payments. *Id.* at 15, 18.

### B. Plaintiff Teresa Follmer's Loan

Teresa Follmer ("Follmer") refinanced her mortgage through First Magnus Financial Corporation in June 2007. Compl. ¶ 64. Under the terms of her loan, Follmer was obliged to make monthly payments of $2,463.88. *Id.* Follmer defaulted on her payment obligations in early 2008. *Id.* ¶ 65.

On October 15, 2009, Follmer received a package from Defendants[3] offering to grant her a TPP under HAMP, under the terms of which her payments would be cut nearly in half, to $1,243.16 per month.[4] *Id.* ¶ 76. On October 18, 2009, Follmer received a TPP Agreement and documentation, which she allegedly returned to Defendants with her December 1, 2009 monthly payment. *Id.* ¶ 77. Follmer alleges that she later made three trial period payments.

---

[3] The Complaint refers to BANA and BAC collectively as "Bank of America." *See* Compl. ¶¶ 12, 20. It is therefore unclear which Defendant – BANA or BAC, or both – undertook the acts alleged. Defendants believe that the only proper Defendant is BAC, as BANA had no involvement in the servicing of Plaintiffs' loans. Because, however, the Complaint fails to state a claim against either Defendant, Defendants reserve for another day any argument as to the propriety of including BANA in the Complaint.

[4] Though the Complaint also references facts that are alleged to have taken place prior to Follmer's receipt of a TPP solicitation, Defendants recite here only those facts that relate to the causes of action Follmer alleges in the Complaint.

5

673566

*Id.* On January 20, 2010, Defendants requested additional documentation from Follmer in order to process her permanent modification, *id.* ¶ 79, and again requested documentation on February 20, 2010, *id.* ¶ 82. On May 6, 2010, Follmer allegedly received a letter from Defendants stating that she was not eligible for the loan modification because she did not make all required payments under the TPP Agreement. *Id.* ¶ 85. Follmer received a notice of intent to accelerate her loan on June 13, 2010. *Id.* ¶ 86. Follmer has not been foreclosed upon, and she remains in her home.

### C.  Plaintiffs John and Katie Lividotti's Loan

John and Katie Lividotti (the "Lividottis") refinanced their mortgage loan in 2007. *Id.* ¶ 89. Under the terms of their loan, they were required to make monthly payments of $936.17. *Id.* In February 2010, the Lividottis received a letter from Defendants stating that they were approved for a modification, "and that they could start making payments in the modified amounts of $678.10 in April of 2010."[5] *Id.* ¶ 92.

Although the Lividottis' modification was effective beginning April 1, 2010, meaning that they still owed their full monthly payments prior that time, they claim to have made only the lower payments for the months of February and March. *Id.* ¶ 96. In April 2010, the Lividottis received a notice of intent to accelerate their loan. *Id.* ¶ 93. On June 1, 2010 and June 30, 2010, the Lividottis allegedly made payments of $914.29. *Id.* ¶¶ 101-102. The Lividottis allege that Bank of America has not decreased the monthly loan amount to comply with the February 2010 loan modification, but the Lividottis have not been foreclosed upon and Mrs. Lividotti remains in her home. *Id.* ¶ 104.

### STANDARD OF REVIEW

A complaint, or any cause of action alleged therein, must be dismissed when it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). This standard is met where a complaint fails to allege sufficient facts which, if true, would provide adequate grounds to entitle a plaintiff to relief. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009); *Bell*

---

[5] Though not stated in the Complaint, the Lividotts' modification was *not* made under HAMP. In May 2010, the Lividottis in fact requested that their modification be cancelled. For purposes of this motion, though, Defendants adhere to the facts as pled in the Complaint.

*Atl. Corp. v. Twombly*, 550 U.S. 544, 554-55 (2007). A complaint containing mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" does not state a claim. *Twombly*, 550 U.S. at 554-55. Rather, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations and emphasis omitted). Where the complaint lacks a "cognizable legal theory" or facts that are sufficient to support a cognizable legal theory, it must be dismissed. *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988).

## ARGUMENT

Plaintiffs' attempt to enforce the provisions of HAMP against Defendants must fail. It is by now well-recognized by the courts – including another judge of this Court – that neither HAMP itself nor the legislation it was created under, the Emergency Economic Stabilization Act of 2008, 12 U.S.C. § 5201 *et seq.*, may be enforced by borrowers like Plaintiffs. *See Marks v. Bank of America, N.A.*, No. 03:10-cv-08039, 2010 WL 2572988, *5-7 (D. Ariz. June 22, 2010). Seeking to make an end-run around this prohibition, Plaintiffs purport to assert a variety of theories under which they pursue relief. However, this attempt must fail, as Plaintiffs may not attempt back-door enforcement of HAMP, "even disguised as a breach of contract claim." *Id.* at *6. In any event, as discussed below, the allegations of the Complaint fail to establish a claim upon which relief can be granted.

**A.     *Plaintiffs Are Not Third-Party Beneficiaries of BANA's Servicer Participation Agreement with the U.S. Treasury.***

Count I of Plaintiffs' Complaint purports to state claims for breach of contract and breach of the duty of good faith and fair dealing. As a basis for these claims, Plaintiffs assert that they are among the intended beneficiaries of a Servicer Participation Agreement ("SPA") entered into between BANA and the Treasury (and attached to the Complaint as Exhibit 1), and that Defendants breached their contractual duties under that SPA "by failing to provide eligible borrowers with the opportunity to accept permanent loan modifications and by wrongfully collecting introductory payments." Compl. ¶¶ 120-122.

7

Plaintiffs' third-party beneficiary claim fails as a matter of law. In the last eight months, no less than eleven Federal District Courts within the Ninth Circuit alone have dismissed lawsuits based on the identical legal theory Plaintiffs advance here – that defaulting borrowers are entitled to recover under an SPA between the Treasury and a loan servicer. *See Marks*, 2010 WL 2572988, *2-5; *Wright v. Bank of America, N.A.*, No. CV 10-01723 JF, 2010 WL 2889117 (N.D. Cal. July 22, 2010); *Hoffman v. Bank of America, N.A.*, No. C 10-2171 SI, 2010 WL 2635773, *3-5 (N.D. Cal. June 30, 2010); *Zendejas v. GMAC Wholesale Mortgage Corp.*, No. 10-CV-00184, 2010 WL 2629899, *3-4 (E.D. Cal. June 29, 2010); *Simmons v. Countrywide Home Loans, Inc.*, No. 09-cv-1245, 2010 WL 2635220, *2-5 (S.D. Cal. June 29, 2010); *Simon v. Bank of America, N.A.*, No. 10-cv-00300, 2010 WL 2609436, *10 (D. Nev. June 23, 2010); *Burtzos v. Countrywide Home Loans*, No. 09-CV-2027W, 2010 WL 2196068, *2 (S.D. Cal. June 1, 2010); *Benito v. IndyMac Mortgage Servs.*, No. 2:09-CV-001218, 2010 WL 2130648, *7-8 (D. Nev. May 21, 2010); *Lucero v. Countrywide Bank N.A.*, No. 09cv1742, 2010 WL 1880649, *3-4 (S.D. Cal. May 10, 2010); *Villa v. Wells Fargo Bank, N.A.*, No. 10-cv-81, 2010 WL 935680, *2-3 (S.D. Cal. March 15, 2010); *Escobedo v. Countrywide Home Loans, Inc.*, No. 09-cv-1557, 2009 WL 4981618, *1-2 (S.D. Cal. Dec. 15, 2009).[6]

That multiple courts have rejected Plaintiffs' position is unsurprising. In *County of Santa Clara v. Astra USA, Inc.*, 588 F.3d 1237 (9th Cir. 2009), the Ninth Circuit explained:

> Demonstrating third-party beneficiary status in the context of a government contract is a comparatively difficult task. We have explained that parties that benefit from a government contract are generally assumed to be incidental beneficiaries, rather than intended ones, and so may not enforce the contract absent a clear intent to the contrary. *This "clear intent" hurdle is not satisfied by a contract's recitation of interested constituencies, vague, hortatory*

---

[6] Only a single court has concluded that private plaintiffs may have a third-party beneficiary claim for breach of contract under an SPA. *See Reyes v. Saxon Mortgage Services, Inc.*, No. 09-cv-1366, 2009 WL 3738177, *1-2 (S.D. Cal. Nov. 5, 2009). Defendants respectfully submit, however, as numerous other courts have observed, that the rudimentary analysis in that case holds little persuasive value when compared to the more thorough, and subsequent, analyses in the cases cited above. Indeed, the judge who decided *Reyes* reached the opposite conclusion in a subsequent case. *See Villa*, 2010 WL 935680 at *2-3.

8

673566

> *pronouncements, explicit reference to a third party, or even a showing that the contract operates to the third parties' benefit and was entered into with them in mind.* Rather, we examine the precise language of the contract for a "clear intent" to rebut the presumption that the third parties are merely incidental beneficiaries.

*Id.* at 1244 (emphasis added). As Judge Teilborg recognized in *Marks*, 2010 WL 2572988 at *3-5, and as the other district courts noted above have also found, Plaintiffs are incapable of making the showing necessary to get over the "clear intent hurdle" and to rebut the strong presumption that they are merely incidental beneficiaries of the SPA. Rather than evincing a clear intent to rebut the presumption, the SPA, in fact, evinces a clear intent to do just the contrary, and to limit its enforcement to the parties who signed it.

In determining whether Plaintiffs are intended beneficiaries, the Court need only look to § 11E of the SPA, which provides that the SPA "shall inure to the benefit of and be binding upon the parties to the Agreement and their permitted successors-in-interest." Compl., Exh. 1 at 10. In *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1212 (9th Cir. 1999), the Ninth Circuit rejected an intended beneficiary argument based on very similar contract language: "This contract binds and inures to the benefit of the parties hereto, their successors and assigns, including without limitation any water users' organization or similar group which may succeed either by assignment or by operation of law to the rights of the United States hereunder." The court concluded that "[t]his language clearly evinces the intent of the parties to limit intended beneficiaries to the contracting parties." *Id.* While the court conceded that the contract "operate[d] to the [third parties'] benefit . . . and was undoubtedly entered into with [them] in mind," it nonetheless determined, on the basis of the above-quoted language, that the parties to the contract did not intend to extend its benefit to those third parties. *Id.*; *cf. Commercial Ins. Co. of Newark v. Pacific-Peru Constr. Corp.*, 558 F.2d 948, 953-54 (9th Cir. 1977) (reinsurer was intended beneficiary of contract providing that "this instrument shall inure to the benefit of any such reinsurer").

In including substantially similar language in the SPA, Bank of America and the Treasury likewise evinced their intent to limit the intended beneficiaries of the SPA to the

673566

contracting parties. *See Escobedo*, 2009 WL 4981618, at *2 (taking note of similar SPA language as evidence that parties intended to limit benefit of contract). As in *Klamath*, Plaintiffs cannot overcome the parties' straightforward expression of their intent to limit the benefit of the SPA. *See Marks*, 2010 WL 2572988, *5 ("While the intent of the HAMP might be to benefit qualified borrowers, statements of purpose are not enough to defeat the presumption against intended beneficiaries under government contracts.").

That the SPA was not intended to benefit third parties such as Plaintiffs is equally evident from § 7. That provision contemplates that disputes as to the performance of the SPA may arise, and provides a mechanism for their resolution – but by "Fannie Mae and Servicer" (i.e., BANA) only. Compl., Exh. 1, at 7 (§ 7); *cf. Marks*, 2010 WL 2572988, at *4 ("Permitting these individual claims would undermine Freddie Mac's role as the compliance officer for the HAMP."). Further, the SPA only permits legal action after the parties have taken "all reasonable steps to resolve disputes internally." Compl., Exh. 1, at 7 (§ 7). As such, permitting third-party suits to enforce the SPA would lead to the anomalous result that the actual parties to the agreement would be required to attempt to resolve disputes amicably out of court before filing suit, whereas third parties would face no such obstacle.

Moreover, the sheer number of borrowers who could bring suit against the Treasury, Bank of America, or other servicers were SPAs enforceable by borrowers lends further support to the conclusion that the SPA was not intended to inure to the benefit of borrowers like Plaintiffs. *See Santa Clara*, 588 F.3d at 1248 ("The breadth and indefiniteness of a class of beneficiaries is entitled to some weight in negating the inference of intended beneficiary status."). As Judge Teilborg noted in *Marks*, to grant borrowers such as Plaintiffs third-party beneficiary status "would be opening the door to potentially 3-4 million homeowners filing individual claims." 2010 WL 2572988 at *4; *see also* Compl., Exh. 2 at 1 (HAMP Supplemental Directive 09-01). To date, Treasury has entered into SPAs with over 100 mortgage loan servicers. *See* Contracts – Making Home Affordable Program, *at* http://www.financialstability.gov/impact/contracts_list.htm (last visited July 21, 2010). Plaintiffs themselves assert that Bank of America has over 1,000,000 HAMP-eligible loans in

673566

its servicing portfolio. Compl. ¶ 52. If Plaintiffs' theory were accepted, the number of borrowers who would be intended beneficiaries with standing to sue under these SPAs would number in the millions – encompassing every borrower who has a loan serviced by one of the more than 100 entities with SPAs. This is far from a "narrow, well-defined class," *Santa Clara*, 588 F.3d at 1248, and Plaintiffs cannot sue under the SPA.[7]

Because Plaintiffs are not third-party beneficiaries of the SPA, they do not have enforceable rights under it. Their SPA-based claims must be dismissed.

### B. *Plaintiffs Cannot Recover for Breach of Contract Based Upon Other Agreements.*

#### 1. Follmer's Trial Period Plan Is Not an Enforceable Contract.

Follmer also seeks to premise her breach of contract claim on the TPP she received from Defendants. *See* Compl. ¶¶ 123-130. The TPP, however, cannot be enforced against Defendants as a matter of law. "[I]t is fundamental that, in order to be binding, an agreement must be definite and certain so that the liability of the parties may be exactly fixed." *Pyeatte v. Pyeatte*, 135 Ariz. 346, 350 (1983); *see also Savoca Masonry Co. v. Homes & Son Constr. Co.*, 112 Ariz. 392, 394 (1975) ("It is elementary that for an enforceable contract to exist there must be . . . sufficient specification of terms so that the obligations involved can be ascertained."). "Terms necessary for the required definiteness frequently include time of performance, place of performance, price or compensation, penalty provisions, and other material requirements of the agreement." *Pyeatte*, 135 Ariz. at 350.

The TPP on which Follmer premises her breach of contract claims fails to set forth any of the essential terms of the permanent modification that Follmer hoped to receive with any clarity. Indeed, the TPP recognizes that Follmer may not receive *any* permanent modification

---

[7] In addition, given the enormous number of borrowers covered by any given SPA, a servicer's voluntary participation in HAMP – which is strongly encouraged by the Treasury – would be *dis*couraged if the servicer were exposed to multiple private causes of action and damages for failing to comply with HAMP requirements. *Cf. Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 299 (2d Cir. 1998) (rejecting Plaintiffs' theory that they were third-party beneficiaries of contracts between landlords and housing authority in party because this "might severely discourage landlord participation in the Section 8 program by creating an open-ended liability for landlord-participants").

11

673566

after the documents and information related to her loan had been considered. Section 2.F of the TPP provides that the TPP can be terminated for a number of reasons, including that the Servicer determines that the borrower's representations are not true and correct. *See* Follmer TPP (attached as Exhibit A to the Declaration of Robert W. Shely in Support of Defendants' Motion to Dismiss ("Shely Decl.")).[8] And, even if the TPP would eventually result in a permanent modification, it contains no description of what the terms of that permanent modification would look like: it does not set forth such essential terms as the amount remaining to be repaid by Follmer, the final interest rate or monthly payment amount of the modified loan, the amount of any principal forbearance, or the date on which the modified loan would mature. *Cf. Lewis v. Amer. Sav. & Loan Ass'n*, 905 F.2d 1540, 1990 WL 89353, *1 (9th Cir. 1990) (unpublished) ("The essential terms of a loan agreement are the amount of the loan, the rate of interest, the terms of repayment, applicable loan fees and charges.").

That the TPP cannot be an enforceable contract is evidenced by HAMP itself. Because Follmer seeks a permanent HAMP modification, there can be no dispute that she must first *qualify* for a permanent modification. But her theory is that any borrower who receives a TPP and makes her three payments *must* be given a permanent modification. *See* Compl. ¶ 45; *see also id.* ¶ 129 (arguing that Defendants should not be given an opportunity to review documentation submitted by Plaintiffs). This theory stands HAMP on its head. Nowhere do HAMP guidelines mandate that any borrower who obtains a TPP and makes payments is guaranteed a permanent modification. Indeed, the guidelines implicitly *reject* that conclusion. At the time Follmer received her TPP, HAMP guidelines expressly permitted a servicer to place a borrower on a trial plan *before* the servicer obtained all of the borrower's documentation and was able to determine eligibility for a permanent modification. Compl., Ex. 2, at 5, 17 ("Servicers are not required to verify financial information prior to the

---

[8] Documents referenced in a complaint can be considered in ruling on a motion to dismiss without converting the motion to a motion for summary judgment. *See Branch v. Tunnell*, 14 F.3d 449, 453-454 (9th Cir. 1994) (overruled on other grounds); *see also Van Buskirk v. Cable News Network, Inc.* 284 F.3d 977, 980 (9th Cir. 2002).

673566

effective date of the trial period."). HAMP guidelines also contemplated that the servicer would evaluate (or reevaluate) the borrower's NPV during the trial plan to determine if the NPV was positive (and thus eligible for modification) or negative (and thus not appropriate for modification).[9] The guidelines do not presume that every trial modification would necessarily result in a permanent loan modification, nor do they expect that every permanent modification will be provided immediately upon completion of the trial plan.

Moreover, the form and substance of TPPs are required by Treasury under the HAMP program. The HAMP TPP upon which Follmer premises her claims was extended to Follmer using a "Form 3156" – the form that Fannie Mae and the U.S. Treasury specifically promulgated for servicers to use when extending TPPs to borrowers.[10] As set forth in HAMP Supplemental Directive 09-01, servicers "must obtain prior written approval from Treasury or Fannie Mae" if they want to use their own TPP documents. Compl., Ex. 2, at 15. As such, the TPPs are part of HAMP and require HAMP eligibility – by merely complying with HAMP's requirements to use a particular form, BAC was not contractually promising Follmer a permanent HAMP modification, nor could it while still complying with HAMP.

For all of these reasons, and as a matter of law, Follmer's TPP cannot be considered an enforceable contract for a permanent loan modification.

2. <u>The Lividottis Have Failed to Plead Facts Establishing a Breach of Contract.</u>

To recover for breach of contract, a plaintiff must, of course, prove that the contract in question has been breached. *Chartone, Inc. v. Bernini*, 207 Ariz. 162, 170 (Ariz. App. 2004).

---

[9] Supp. Dir. 10-01, at 10, https://www.hmpadmin.com/portal/docs/hamp_servicer/sd1001.pdf (Jan. 28, 2010); *see also* HAMP FAQs at 27-28 (April 2, 2010) (Q2314), *available at* https://www.hmpadmin.com/portal/docs/hamp_servicer/hampfaqs.pdf.

[10] *See* News and Updates 2009 – Home Affordable Modification Trial Period Plan, *at* https://www.efanniemae.com/sf/formsdocs/documents/newsupdates/newsandupdates2009.jsp (describing Fannie Mae's creation of the Form 3156 in March & April 2009). Form 3156 has since been discontinued and replaced by a form entitled "Making Home Affordable Program Request For Modification and Affidavit." *See* Supplemental Directive 09-07, at 6-7 (Oct. 8, 2009), *available at* https://www.hmpadmin.com/portal/docs/hamp_servicer/sd0907.pdf.

13

673566

In asserting claims for breach of contract based upon their own purported modification agreement with Defendants, the Lividottis assert that Defendants engaged in a course of conduct that breached that agreement: Defendants allegedly sent the Lividottis a notice of intent to accelerate the loan and foreclose on the property, required them to make payments in excess of their modified payments, and reported them as delinquent to credit reporting agencies. Compl. ¶¶ 89, 98-99. None of this conduct, however, establishes a breach of the Lividottis' modification by Defendants. As the Lividottis themselves admit, their modified payments were not effective until April 2010. *Id.* ¶ 92; *see also* Lividotti Modification Agreement ¶¶ 1-2 (attached as Exhibit B to Shely Decl.).[11] Under that modification, the Lividottis continued to be bound by the terms and provisions of their original mortgage agreement, except as otherwise specified. *See* Lividotti Modification Agreement at ¶ 4. Thus, prior to April 1, 2010, the Lividottis were still required to make their regular monthly payments of $936.17. *See* Compl. ¶ 89. Despite this obligation, the Lividottis did not make their regular monthly payments for the months of February and March, but instead made only reduced payments of $678.10. *Id.* ¶ 96.

Accordingly, because the Lividottis failed to make the full amounts due under their loan agreement, they were in default of their payment obligations and Defendants were wholly within their rights in accelerating the Lividottis' loan, demanding additional payments from them, and reporting them as delinquent to credit reporting agencies. *See* Lividotti Note § 6 (attached as Exhibit C to Shely Decl.); Lividotti Deed of Trust §§ 1, 9, 14 (attached as Exhibit D to Shely Decl.). Because they are unable to establish a breach by Defendants, the Lividottis cannot recover for breach of contract.

3. <u>Plaintiffs Have Alleged No Cognizable Harm or Damages</u>.

Damages are an "essential element" of a plaintiff's breach of contract claim. *Bernini*, 207 Ariz. at 170. In addition to failing to establish an enforceable contract (as to Follmer) or a breach of contract (as to the Lividottis), the Complaint identifies no monetary harm or

---

[11] This court may properly consider the Lividottis' modification agreement when ruling on this motion to dismiss. *See supra* n. 8.

673566

damages to any of Plaintiffs as a result of the alleged breaches. Plaintiffs' allegations of harm amount to little more than an averment that as a result of the alleged breaches, "Plaintiffs forewent other remedies that might be pursued to save their home *[sic]*, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their default, such as selling their home." Compl. ¶ 133. This is plainly wrong on its face. Nothing currently prevents Plaintiffs from declaring bankruptcy or putting their homes on the market. They could have done so yesterday, they could still do so today, and they will be able to do so tomorrow.

Any other "remedies" or "strategies" that Plaintiffs may have foregone as a result of the alleged breach here are not pleaded with enough particularity to satisfy the requirement of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-55 (2007), that the factual allegations in the Complaint "must be enough to raise a right to relief above the speculative level." Similarly, the bald assertion that "[s]ome putative class members have suffered additional harm in the form of foreclosure activity against their homes," Compl. ¶ 133, does not sufficiently plead that the Plaintiffs themselves have suffered any harm. Neither Follmer nor the Lividottis claims to have been foreclosed upon. The Complaint identifies no harm or damages to Plaintiffs as a result of BAC's alleged breaches of the TPPs, and Plaintiffs' breach of contract claim must be dismissed.

### C. Plaintiffs' Claims for Breach of the Duty of Good Faith and Fair Dealing and Promissory Estoppel Must Fail for the Same Reasons.

#### 1. Plaintiffs Cannot Recover for Breach of the Duty of Good Faith and Fair Dealing.

For multiple reasons, Plaintiffs have not stated a claim for breach of the duty of good faith and fair dealing. To begin, a critical hurdle any plaintiff must clear in order to state a claim for breach of the duty of good faith and fair dealing is to establish the existence of a contract. *See Norman v. State Farm Mutual Auto Ins. Co.*, 201 Ariz. 196, 203 (Ariz. App. 2001) (covenants of good faith and fair dealing "presume the existence of a valid contract"). As already set forth in detail above, the TPP under which Follmer seeks recovery is not an

enforceable contract. This alone bars her entitlement to relief. In addition, to state a claim for recovery under this theory, a party must sufficiently allege damages. *See United Dairymen of Arizona v. Schugg*, 212 Ariz. 133, 138-39 (Ariz. App. 2006) (damages part of prima facie case for breach of covenant of good faith and fair dealing). For the same reasons set forth above, none of the Plaintiffs have pled cognizable damages for breach of the duty of good faith and fair dealing, and that claim must be dismissed.

### 2. Plaintiffs Cannot Recover for Promissory Estoppel.

Plaintiffs' alternative theory of relief for recovering under the TPPs – promissory estoppel – fares no better than their claims for breach of contract and breach of the covenant of good faith and fair dealing. To prove promissory estoppel, a plaintiff must prove (1) that the defendants made a promise; (2) that the defendants should have reasonably foreseen that the plaintiff would rely on the promise; and (3) that the plaintiff relied on the promise to his detriment. *Higginbottom v. State*, 203 Ariz. 139, 144 (Ariz. App. 2002).

As discussed, Follmer's TPP lacks the definiteness required of an enforceable contract; indeed, at the time the TPP was entered it was uncertain as to whether Follmer would even qualify for a permanent modification. This same lack of definiteness made it unreasonable for Follmer to rely upon any alleged promise by Defendants to modify her loan. *Cf. Marks*, 2010 WL 2572988, at *4 (because loan servicer is only required to *consider* borrower for modification, "Plaintiff could not have . . . reasonably believed that Defendant was obligated to modify her loan"). And in the Lividottis' case, it was the Lividottis who were in breach of the terms of their contract. Defendants were contractually entitled to take the actions that Plaintiffs complain of – no promise to them was broken, so there is no injustice to be avoided by enforcing that promise. *See supra* at 13; *cf. Killingsworth v. State Farm Mutual Auto Ins. Co.*, No. CV 03-1950 PHX NVW, 2005 WL 2450109, *5 (D. Ariz. Sept. 30, 2005) ("There having been no promise, [Plaintiff] has no alternative claim for promissory estoppel.").

Moreover, Plaintiffs simply have not pled facts establishing that they relied on Defendants' alleged promises to their detriment. *See Contempo Constr. Co. v. Mountain States Tel. & Tel. Co.*, 153 Ariz. 279, 282 (Ariz. App. 1987) (noting that plaintiff must plead

16

673566

facts establishing detrimental reliance to state claim for promissory estoppel). The sole harm Plaintiffs allege as a result of their reliance on the supposed promises is that they "have lost the opportunity to fund other strategies to deal with their default and avoid foreclosure." Compl. ¶ 140. If Plaintiffs are again referring to the possibility that they could have or would have filed for bankruptcy or sold their homes, this is, as discussed above, a red herring, because Plaintiffs are still fully capable of doing either of those things if they wish. And, to the extent that Plaintiffs are referring to different "strategies," these damages are purely speculative and therefore not pleaded with enough particularity to satisfy the strict pleading requirements of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-55 (2007).

Because Plaintiffs have failed to identify a detrimental change in their position as a result of any allegedly broken promise, their promissory estoppel claim must be dismissed.

### D. *Plaintiffs Failed to Plead Their Claim Under the Arizona Consumer Fraud Act With Particularity.*

Plaintiffs' claims under the Arizona Consumer Fraud Act ("ACFA"). A.R.S. § 44-1521, *et seq*. must be dismissed in the first instance because plaintiffs cannot enforce Defendants' obligations under HAMP, as Plaintiffs perceive them, merely by clothing their HAMP-based claims in state-law causes of action. HAMP does not provide plaintiffs with the right to privately enforce its terms – whether directly or under state law. *See Marks*, 2010 WL 3572988, *6 (rejecting "disguised" breach of contract claim as an attempt to enforce a private right of action under HAMP); *Aleem v. Bank of America, N.A.*, No. EDCV 09-01812, 2010 WL 532330, *3-4 (C.D. Cal. Feb. 9, 2010) (rejecting plaintiff's attempt to recover for alleged HAMP violations by means of claim under California Unfair Competition Law). State laws cannot be used to create private rights of action where none exist under federal law. *Aleem*, 2010 WL 532330 at *3-4 ("UCL cannot create a private right of action where none exists under the federal statute"). The ACFA claim should be dismissed.

The ACFA claim also fails for failure to plead fraud with particularity under Rule 9(b). To state a claim under the ACFA, Plaintiffs must allege a (1) false promise or misrepresentation made in connection with the sale or advertisement of merchandise and

673566

(2) plaintiffs' proximate injury. *Kuehn v. Stanley,* 91 P.3d 346, 351 (Ariz. Ct. App. 2004). Claims brought under the ACFA must also meet the heightened pleading requirements set forth under Rule 9(b) of the Federal Rules of Civil Procedure. *Grismore v. Capital One F.S.B.,* 2007 WL 841513 at *6 (D.Ariz. Mar. 16, 2007) (dismissing ACFA claim for failure to satisfy heightened pleading requirements under Rule 9(b) of the Federal Rules of Civil Procedure); *Williamson v. Allstate Ins. Co.,* 204 F.R.D. 641, 644 (D. Ariz. 2001) (same).

In support of their ACFA claim, Plaintiffs make conclusory allegations that Defendants led "borrowers to believe that [they] had either already permanently modified their loans or would permanently modify their loans" or that defendants made "false promises and misrepresentations . . . to the U.S. Government." Complaint ¶¶ 144, 145. Plaintiffs do not identify what the false statements were, who made the false statements, and why they were false or misleading. By neglecting to identify the requisite "who, what, when, where and how" of the allegedly wrongful conduct, Plaintiffs' claim is necessarily deficient. *Silvas v. GMAC Mortgage, LLC,* No. CV-09-265-PHX-GMS, 2009 WL 4573234, *7 (D. Ariz. Dec. 1, 2009) (dismissing ACFA claim for failure to plead with particularity). Nor do Plaintiffs successfully allege how the alleged fraud proximately caused them injury; as discussed above, Plaintiffs have not adequately alleged any harm or damages suffered as a result of Defendants' alleged conduct.

## CONCLUSION

For these reasons, Defendants Bank of America, N.A. and BAC Home Loans Servicing, LP respectfully request that the Court grant this Motion and dismiss Plaintiffs' Class Action Complaint.

RESPECTFULLY SUBMITTED this 2nd day of August, 2010.

BRYAN CAVE LLP

By: s/ Robert W. Shely
    Robert W. Shely, #014261
    Two N. Central Avenue, Suite 2200
    Phoenix, AZ 85004-4406
    Attorneys for Defendants

673566

1 | Copy of the foregoing electronically
2 | filed using the CM/ECF System
3 | this 2nd day of August, 2010.

4

s/ Kathy J. O'Reilly

673566